# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ANIMAL LEGAL DEFENSE FUND,
  525 E. Cotati Ave, Cotati CA 94931;

CENTER FOR BIOLOGICAL
  DIVERSITY,
  P.O. Box 710, Tucson, AZ 85702;

CENTER FOR FOOD SAFETY,
  660 Pennsylvania Ave SE, Suite 302,
  Washington DC 20003; and

FOOD ANIMAL CONCERNS TRUST,
  3525 W Peterson Ave # 213, Chicago, IL
  60659

                *Plaintiffs*,

        v.

XAVIER BECERRA, Secretary of the U.S.
Department of Health and Human Services,
in his official capacity;

ROBERT M. CALIFF, Commissioner of
the U.S. Food and Drug Administration, in
his official capacity; and

U.S. FOOD AND DRUG
ADMINISTRATION,

                *Defendants*.

Case No. 24-cv-857

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      This is a complaint for declaratory and injunctive relief to require the U.S. Food and Drug Administration ("FDA")[1] to provide substantive responses to: (1) a Citizen Petition by Plaintiffs Animal Legal Defense Fund ("ALDF") and Center for Food Safety ("CFS"), submitted on December 20, 2012 ("2012 Petition"), and (2) a related Citizen Petition by Plaintiffs ALDF, Food Animal Concerns Trust ("FACT"), and the Center for Biological Diversity ("CBD"), submitted on June 8, 2020 ("2020 Petition," together with the 2012 Petition, "the Petitions"). The Petitions request that FDA reassess its approval of and residue tolerances for the animal drug ractopamine. Ractopamine is a controversial drug that causes severe physical and psychological harm to animals who receive it, is detrimental to human health and worker safety, and is toxic to the environment.

2.      Ractopamine is a nontherapeutic, beta-agonist drug created and marketed by Elanco Animal Health for the purpose of boosting growth rates in the farmed animals to which it is administered. In the United States it is widely used in the industrial raising of pigs, cows, and turkeys in concentrated animal feeding operations ("CAFOs," also commonly known as factory farms) for the purpose of producing meat and meat products. It is generally administered during the animal's final weeks of life.

3.      Animals treated with beta-agonists such as ractopamine face increased likelihood of experiencing painful injury, inhumane treatment, and extreme stress. Scientific studies and other evidence, including that in FDA's own files, also links ractopamine to human heart and respiratory issues in meat consumers and farm workers, increased risk of pathogen contagion, and intensified

---

[1] For purposes of this Complaint, Defendants U.S. Department of Health and Human Services Secretary Xavier Becerra and U.S. Food and Drug Administration and Commissioner Robert M. Califf are individually and collectively referred to as "FDA."

environmental pollution through seepage and runoff to ground and surface waters. Accordingly, ractopamine is banned or restricted in meat production in at least 160 countries, including China and all countries in the European Union.

4.      Nonetheless, FDA has approved ractopamine for use in cows, pigs, and turkeys raised for meat in the United States, 21 C.F.R. § 558.500, and continues to allow ractopamine residue levels in meat that exceed those adopted by the United Nations' food standards body, the Codex Alimentarius Commission, *id*. § 556.570.

5.      Accordingly, Plaintiffs ALDF and CFS submitted their 2012 Petition requesting that FDA review the Codex standards for ractopamine; publish the petition in the Federal Register and provide opportunity for comment; perform comprehensive scientific studies to characterize risks to animals, humans, and the environment posed by ractopamine use; and ban or adopt more protective standards for ractopamine use. Plaintiffs ALDF, CBD, and FACT then submitted their related 2020 Petition requesting immediate suspension of ractopamine's approval because the drug has not been shown to be safe and poses an imminent threat to human health and the environment.

6.      Thus far, FDA has only provided a partial response to the 2020 Petition, resolving a part of the petition related to conditions created by the COVID-19 pandemic. FDA has not issued a final decision on the 2012 Petition or the 2020 Petition's request for withdrawal of ractopamine's approval independent of conditions presented by the COVID-19 pandemic.

7.      The Administrative Procedure Act ("APA"), 5 U.S.C. § 555(b), requires federal agencies to decide on all rulemaking petitions within a "reasonable" period of time. FDA has violated this mandate by failing to provide Plaintiffs with final decisions on the Petitions. Because FDA has unreasonably delayed responding to the Petitions, Plaintiffs seek a declaration that FDA has violated the APA and an order compelling the agency to provide Plaintiffs with substantive responses to the Petitions pursuant to 5 U.S.C. § 706(1).

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (actions against the United States), and 5 U.S.C. § 702 (APA).

9.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because the residence of federal officers is the place where the officers perform their official duties, and Defendant Becerra works in his official capacity in the District of Columbia.

10.     This Court may award all necessary injunctive relief pursuant to the APA, 5 U.S.C. § 706(1), and may award declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

## PARTIES

### A. Plaintiffs

11.     Plaintiff **Animal Legal Defense Fund ("ALDF")** is a national nonprofit membership organization founded in 1979 in Cotati, California. ALDF's mission is to protect the lives and advance the interests of animals through the legal system. Advocating for effective oversight and regulation of the development, expansion, and pollution of the industrial animal agriculture industry across the United States is one of ALDF's central goals, which it achieves by: filing lawsuits, administrative comments, and rulemaking petitions to increase legal protections for animals; supporting strong animal protection legislation; and fighting against legislation, such as state "Ag Gag" laws, that is harmful to animals and communities surrounding CAFOs and slaughterhouses. Through these efforts, ALDF seeks to ensure transparency in industrial animal agriculture, which is paramount to its ability to protect farmed animals and ALDF members from the immensely harmful effects of CAFOs and slaughterhouses.

12.    ALDF has more than 300,000 members and supporters throughout the United States, many of whom live near, recreate near, and closely monitor CAFOs and slaughterhouses in their communities.

13.    More specifically, ALDF has individual members and supporters who live, recreate, and eat fish caught downstream from CAFOs and slaughterhouses. These individuals are aware that FDA approved use of ractopamine in farmed animals without sufficient information to ensure its safety. They are concerned about exposure to and are harmed by FDA's regulations that allow use of ractopamine in farmed animals, and especially the risk that ractopamine will migrate from CAFOs and slaughterhouses to contaminate waterways and groundwater. These members are concerned about and at direct risk of human health impacts from environmental exposure to ractopamine.

14.    ALDF members and supporters are also aware that FDA approved ractopamine without adequately studying its environmental effects. These individuals enjoy seeing wildlife in areas downstream from CAFOs and slaughterhouses while walking, hiking, and biking. They are concerned about ractopamine's effects on these wild animals and their habitat, and therefore their enjoyment of these activities is diminished by the increased risk of harm ractopamine presents for wildlife and their habitat.

15.    ALDF also has members and supporters who consume meat products and buy meat products for their families from grocery stores and restaurants—products which can be sourced from CAFOs that likely use ractopamine. These individuals are aware that FDA approved ractopamine use in farmed animals raised for meat and allows residual ractopamine in meat products without sufficient evidence to ensure ractopamine's safety. To alleviate their concerns and avoid risks to their health, these members are forced to pay premiums to purchase meat products derived from animals that they believe were not treated with ractopamine, such as organic

or drug-free meat. Some individual ALDF members find it both difficult and cost-prohibitive to source their meat from local farms that do not treat their animals with animal drugs like ractopamine, requiring them to alter their eating habits in response to their inability to source ractopamine-free meat products. Individual ALDF members who consume meat also are concerned about, and do not want to financially support, farms that inflict additional negative effects on farmed animals and the environment, and therefore seek to buy meat products raised without the use of ractopamine for this reason as well.

16.     For example, one ALDF member, Sarah Duey, is concerned about ractopamine's potential health effects on her family. Sarah lives in Nebraska with her husband and their four children. While Sarah does not eat meat, she does buy meat products from grocery stores and restaurants for her family. Sarah is aware that FDA approved the use of ractopamine in meat production without sufficient information to ensure its safety. To alleviate this concern and avoid health risks to her family, she takes measures to acquire products from pigs, cows, and turkeys who are raised humanely and without drugs like ractopamine. However, she often finds it difficult to ascertain whether the meat products she purchases for her family are free from ractopamine, because labeling is often unclear and there are no requirements to include specific information about ractopamine. Ultimately, to avoid purchasing meat that comes from animals treated with ractopamine, Sarah pays a premium and spends a significant amount of time identifying products that are drug-free and humanely raised, including from farmers' markets and specialty grocery stores.

17.     Sarah also deeply cares about farmed animals and is gravely concerned about ractopamine's effects on the quality of life for farmed animals, and the very serious behavioral, psychological, and physical issues that beta-agonists like ractopamine cause to them. She does not want to financially support companies that needlessly hurt farmed animals' quality of life through

ractopamine use, and it upsets her to think of these harmful practices. But because of the lack of public access to information about drugs in the meat supply, she is concerned that she is unknowingly financially supporting these inhumane practices.

18.    Likewise, Sarah is concerned about ractopamine's impact on aquatic life and the water quality near her home. Sarah and her family regularly recreate in waterways throughout Nebraska. Her sons fish in many of these locations, and her family eats the fish they catch. She is worried that the fish may not be safe to eat because of the proximity to CAFOs that may use ractopamine, and she is saddened by feeling the need to restrict her sons' abilities to engage in an activity they enjoy. She and her family also enjoy biking along these waterways, with a particular interest in observing wildlife. She is aware that beta-agonists have been found to be toxic to aquatic life, and that their environmental impacts may not have been adequately assessed. She is concerned that ractopamine is reducing the health or number of aquatic animals she observes, as well as the health of the birds who rely on them for food. This negatively affects her enjoyment of the outdoors.

19.    Another ALDF member, Kathy Kowalski, does not buy conventional meat or poultry because of her concerns about animal drugs, including ractopamine, and the industrial agriculture practices they perpetuate. Because she cannot find drug-free, high-welfare meat products at her local stores and restaurants, she orders meat and poultry from a farmer where she can verify that it meets her standards. This specially sourced meat and poultry is much more expensive, but she pays a premium because it is particularly important to her that the meat and poultry she consumes comes from animals who were humanely raised and were not given unnecessary drugs, including ractopamine.

20.    Kathy is also highly concerned about the environmental and health impacts from ractopamine, including its impacts on her drinking water, wildlife, and recreational resources near

6

her home in Iowa. Kathy resides in Sabula, Iowa's only "island city," and she lives in a section of the city that is directly on the riverbank. Kathy gets her water from a private well and has had her well tested in the past because she is concerned about contamination by agricultural pollution. However, she is not aware of any readily available water testing for the presence of pharmaceuticals such as ractopamine, so she fears that her tap water could be contaminated without her knowledge.

21.     Kathy has no assurance that the wildlife and natural spaces where she recreates are safe from ractopamine. Kathy knows that beta-agonists generally have been found to be toxic to aquatic life, and she is concerned that the impacts of ractopamine on wild animals and their environments have not been adequately assessed or addressed by FDA. Ractopamine's potential to reduce the health and number of aquatic animals Kathy views while participating in outdoor activities also negatively affects her enjoyment of the outdoors. Kathy would like to go kayaking and swimming in the Mississippi River near her home but is hesitant to do so knowing that it risks exposing her to ractopamine, as she is not aware of any testing at popular swimming and recreational sites that would pick up the presence of pharmaceuticals like ractopamine. Kathy is concerned that there is no way to protect herself from this type of environmental contamination unless she avoids the water completely.

22.     Plaintiff **Center for Biological Diversity ("CBD")** is a non-profit, 501(c)(3) corporation with its headquarters in Tucson, Arizona, and offices in Mexico and across the United States, including in California, Oregon, Arizona, Colorado, Minnesota, New York, North Carolina, Florida, and Washington, D.C. CBD was founded in 1989 to fight the growing number of threats to biodiversity. Through science, policy, and law, CBD works to secure a future for all species, great or small, especially those hovering on the brink of extinction. To achieve its mission, CBD

7

maintains a full-time staff of scientists, lawyers, and other professionals who work exclusively on campaigns to save species and their habitats.

23.     CBD is actively involved in species and habitat protection issues throughout the United States, including the U.S. territories, as well as outside of the United States and works to secure protections for all species. One of CBD's flagship programs is its environmental health program, which focuses on the adverse impacts of industrial agriculture, including CAFOs and slaughterhouses.

24.     CBD has 79,143 members that live throughout the United States, including those who view, photograph, and otherwise appreciate threatened and endangered species that may be affected by ractopamine pollution and ecosystem impairment from CAFOs and slaughterhouses; who live near these species, habitats, and ecosystems; and who intend to visit and enjoy these species, habitats, and ecosystems in the future. CBD's members rely on the organization to represent their interests in protecting biodiversity and conserving threatened and endangered species and their habitats.

25.     Plaintiff **Center for Food Safety ("CFS")** is a public interest organization with more than 1 million members nationwide, and offices in San Francisco, California; Portland, Oregon; and Washington, District of Columbia. CFS's mission is to protect the public's right to know how their food is produced. CFS is dedicated to protecting human health and the environment by curbing the proliferation of harmful food production technologies, such as animal factories or CAFOs, and instead promoting sustainable agriculture. CFS was established for the purpose of protecting the public by challenging harmful food production technologies and promoting sustainable alternatives. CFS works to inform, educate, and counsel its members and the public on the harm done to human health, animal welfare, and the environment by industrial agriculture.

26.     Since its inception in 1997, CFS has advocated for increased regulation of CAFOs, including the environmental and human health risks of animal drugs used at CAFOs. This advocacy takes many forms, including legal petitions for rulemaking, public education, grassroots organizing, media outreach, and when necessary, litigation, to promote transparency and accountability in the factory farm and industrial agriculture industry.

27.     CFS members have an aesthetic interest in keeping the areas where they recreate, hike, watch birds, swim, and live free of manure contaminated with ractopamine, antibiotics, and steroids. Many CFS members reside or recreate near CAFOs and slaughterhouses where the use of ractopamine, antibiotics, and steroids compromises native ecosystems and wildlife. FDA's approval of the use of ractopamine in farmed animals without sufficient analysis of its environmental effects injures their aesthetic and recreational interests.

28.     FDA's approval of ractopamine in farmed animals without sufficient understanding of its risks also injure the consumer interests of CFS members. Many CFS members consume meat products and are concerned about exposure to ractopamine residue in the meat products they purchase and eat. To avoid exposure to their health, these CFS members must go out of their way to secure meat from specialty markets that carry organic or drug-free meat that they trust, often at a higher price than conventional meat products. The extra time and resources CFS members spend to avoid exposure to ractopamine to protect their health injures their consumer interests.

29.     Plaintiff **Food Animal Concerns Trust ("FACT")** is a national nonprofit organization based in Chicago, Illinois. Since its founding in 1982, FACT has been dedicated to improving the welfare of farmed animals, addressing public health problems that come from the production of meat, milk, and eggs, and broadening opportunities for family farmers. FACT conducts research and makes science-based recommendations to agricultural, public health, and environmental organizations and to federal regulatory agencies. The organization advocates for

responsible use of animal drugs and publishes reports and "score cards" to educate the public and urge regulators to phase out the routine, nontherapeutic use of medically important antibiotics in food-producing animals.

30.     FACT's Humane Farming Program partners with, and invests in, family farmers seeking to raise their animals humanely by providing them with grants, mentorship, scholarships, and webinars. FACT's Safe and Healthy Food Program advocates for strong corporate and government policies such as ending the overuse of antibiotics on farms, banning dangerous veterinary drugs, and requiring farms to control foodborne pathogens. FACT's Safe and Healthy Food Program is recognized for its work to push the FDA's Center for Veterinary Medicine to meet the agencies mission to protect public health when making decisions around animal drugs. FACT's programs take a One Health approach that looks at the interconnection between human, animal, and environmental health. FACT has used this approach to advocate against the use of drugs that have negative human, environmental, and animal health impacts such as arsenical feed additives and carbadox. FACT, its board members, and supporters, are concerned about the impacts of ractopamine use on animal health, food safety, and the environment.

31.     Plaintiffs and their members have a strong interest in preventing FDA's ongoing approval of and permissive residue tolerances for unsafe animal drugs that may harm public health, the environment, or animal health and welfare. Plaintiffs' members are aware of and harmed by FDA's continued approval of ractopamine and the agency's ractopamine residue tolerances, despite ractopamine not being shown to be safe for use. These harms are both individual and cumulative in nature. These harms are concrete and ongoing by virtue of the FDA regulations that actively allow ractopamine to be used on farmed animals and be present in meat products.

32.     Plaintiffs and their members also suffer procedural and informational injuries from FDA's unreasonable delay in responding to the Petitions. FDA's unreasonable delay violates

Plaintiffs and their members' procedural rights to receive a response to the Petitions, and to participate in the rulemaking process through comments, information sharing, and advocacy. If FDA responds to the Petitions and begins the regulatory processes requested in the Petitions, Plaintiffs and their members would participate in the processes, gain information about FDA's review of ractopamine, and advocate for more protective standards. This would, in turn, increase the likelihood that FDA will eliminate or reduce the use and presence of ractopamine in industrial animal agriculture.

33.    The relief requested would redress these harms by requiring FDA to issue final decisions on the Petitions. Substantive responses to the Petitions would either grant the Petitions and fulfill FDA's statutory duty under the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. § 301, *et seq*., ("FDCA") to promote public health by ensuring animal drugs are safe and effective or provide Plaintiffs an avenue to challenge denials of the Petitions in court.

**B.  Defendants**

34.     Defendant **Xavier Becerra** is the Secretary of the U.S. Department of Health and Human Services, which includes FDA. The Secretary of the U.S. Department of Health and Human Services, "through the Commissioner" of FDA, regulates animal drugs. 21 U.S.C. § 393(d)(2). Secretary Becerra is named a Defendant solely in his official capacity.

35.     Defendant **Robert M. Califf** is the Commissioner of the U.S. Food and Drug Administration. In that capacity, Commissioner Califf is responsible for overseeing the FDA review process for animal drugs, and is tasked with the authority to issue, amend, or revoke FDA regulations. The Commissioner is directly responsible for reviewing and ruling on citizen petitions. Commissioner Califf is named as a Defendant solely in his official capacity.

36.     Defendant **U.S. Food and Drug Administration ("FDA")** is a federal agency within the U.S. Department of Health and Human Services. FDA is charged with the regulation of

11

medical products, tobacco, foods, and veterinary medicine, and the implementation and administration of the relevant portions of the FDCA. As described by the agency itself, FDA is responsible for protecting public health by ensuring that human and veterinary drugs are safe and effective. FDA, through its Commissioner, is responsible for reviewing and ruling on each citizen petition filed before the agency.

## STATUTORY AND REGULATORY FRAMEWORK

### A.  Federal Food, Drug, and Cosmetics Act and FDA Regulations

37.     In enacting the FDCA in 1938, Congress provided FDA with the authority and obligation to protect public health and safety by overseeing certain food products, drugs, and cosmetics. Through the FDCA, Congress charged FDA with "promot[ing] the public health" by ensuring that "foods are safe, wholesome, sanitary, and properly labeled" and "human and veterinary drugs are safe and effective." 21 U.S.C. § 393(b).

38.     A "new animal drug" is any drug intended for use in animals that has not been used to a material extent or for a material time and is not recognized by "experts qualified by scientific training and experience" as safe and effective for use under the conditions prescribed. *Id*. § 321(v).

39.     The FDCA requires a new animal drug applicant to submit reports to demonstrate whether its drug is "safe and effective for use." *Id*. § 360b(b)(1)(A). The applicant must also submit "other use restrictions . . . in order to assure that the proposed use of such drug will be safe." *Id*. § 360b(b)(1)(H). FDA regulations require an applicant to submit evidence to establish the "safety and effectiveness" of a new animal drug. 21 C.F.R. § 514.1(8).

40.     The FDCA requires FDA to refuse any new animal drug application where: (1) the results of "adequate tests by all methods reasonably applicable" either "show that such drug is unsafe for use under [prescribed] conditions or do not show that such drug is safe for use under such conditions"; (2) it "has insufficient information to determine whether such drug is safe for

12

use under such conditions"; (3) or "there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. § 360b(d)(1).

41.     Any interested person may petition the Commissioner to require additional or continued studies with an animal drug for which a new animal drug application has been approved. 21 C.F.R. § 310.303(b).

42.     FDA has a mandatory duty to withdraw approval of a new animal drug application if: (1) "experience or scientific data show that such drug is unsafe for use under the conditions of use upon the basis of which the application was approved or the condition of use authorized under [the FDCA]"; (2) new evidence, tests, or methods developed since approval of the application show that the drug is not safe for use "under the conditions of use upon the basis of which the application was approved . . . "; or (3) new information, combined with the evidence available at the time the application was approved show a "lack of substantial evidence that such drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 360b(e)(1).

43.     FDA may suspend approval of an animal drug immediately if it finds that the drug presents an "imminent hazard to the health of man or animals." *Id*. § 360b(e)(1)(F).

44.     The FDCA does not define the phrases "safe and effective" or "safety and effectiveness," nor the term "effective." The statute states generally that the term "safe" "has reference to the health of man or animal." *Id*. § 321(u). In considering whether a drug is "safe," FDA may consider, among other things: (1) "the cumulative effect on man or animal of such drug"; (2) "safety factors" that experts consider appropriate; and (3) whether the conditions in the proposed labeling are reasonably certain to be followed. *Id*. § 360b(d)(2). When evaluating the sufficiency of the information about a drug's safety and effectiveness, FDA must similarly

consider "(A) the probable consumption of such drug and of any substance formed in or on food because of the use of such drug, (B) the cumulative effect on man or animal of such drug, taking into account any chemically or pharmacologically related substance, (C) safety factors which in the opinion of experts, qualified by scientific training and experience to evaluate the safety of such drugs, are appropriate for the use of animal experimentation data, and (D) whether the conditions of use prescribed, recommended, or suggested in the proposed labeling are reasonably certain to be followed in practice." 21 C.F.R. § 514.111(a)(4).

45.    FDA must review "[a]ll food standards adopted by the Codex Alimentarius Commission," and accept without change, accept with change, or not accept each standard. 21 C.F.R. § 130.6(a). The Codex Alimentarius Commission is a joint program of the United Nations Food and Agriculture Organization and World Health Organization that adopts recommended standards for food products which member countries, including the United States, are then obliged to consider for adoption. *Pineapple Growers Ass'n of Haw. v. Food & Drug Admin*., 673 F.2d 1083, 1084 (9th Cir. 1982) (citing 37 Fed. Reg. 21102 (Oct. 5, 1972)).

46.    Review of Codex standards is accomplished any of three ways: (1) any interested person may petition the Commissioner to adopt a Codex standards, and if reasonable grounds are provided in petition, the Commissioner shall publish the petition in the Federal Register with opportunity for comment; (2) the Commissioner may on his own initiative propose by publication in the Federal Register the adoption of a Codex standard; (3) any other Codex standards may be published in the Federal Register for review and informal comment, after which the Commissioner shall either publish a proposal to adopt the standard or notice terminating consideration of such a standard. 21 C.F.R. § 130.6(b).

47.    FDA may set residue tolerance levels for new animal drugs, exempting the drug or edible portions of animals containing such drugs from being "unsafe" under the FDCA. 21 U.S.C.

§ 360b(a)(6). In setting a residue tolerance, FDA "shall rely on data sufficient to demonstrate that a proposed tolerance is safe" and "may consider and rely on data . . . [available from] the Codex Alimentarius Commission . . . ." *Id*. FDA "may revoke a tolerance . . . if scientific evidence shows the tolerance to be unsafe." *Id*.

## B. FDA Citizen Petitions

48.     FDA's regulations allow an interested person to petition FDA to "issue, amend, or revoke a regulation or order, or to take or refrain from taking any other form of administrative action." 21 C.F.R. § 10.25; *see id*. § 10.30.

49.     FDA must rule on each citizen petition filed with the agency. 21 C.F.R. § 10.30(e)(1); *see id*. § 10.30(e)(2)–(3).

50.     The Commissioner must respond within 180 days of receipt of a citizen petition by approving the petition, denying the petition, dismissing the petition if it has been rendered moot, or providing a tentative response indicating why the agency has not yet been able to reach a decision on the petition. 21 C.F.R. § 10.30(e)(2). In a tentative response, the Commissioner "may also indicate the likely ultimate agency response and may specify when a final response may be furnished." *Id*. § 10.30(e)(2)(iv).

51.     The Commissioner "may grant or deny such a petition, in whole or in part, and may grant such other relief or take other action as the petition warrants." 21 C.F.R. § 10.30(e)(3). The petitioner must be "notified in writing of the Commissioner's decision." *Id*.

## C. Administrative Procedure Act

52.     The APA requires federal agencies to "give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

53.     Agencies must respond to a rulemaking petition "within a reasonable time." *Id.* § 555(b). The APA requires that agencies provide "prompt notice . . . of the denial" of a rulemaking petition along with a "brief statement of the grounds for the denial." *Id.* § 555(e).

54.     The APA defines agency "failure to act" as an "agency action." *Id.* § 551(13).

55.     The APA further provides that the court "shall [] compel agency action unlawfully withheld or unreasonably delayed . . . ." *Id.* § 706(1).

## FACTUAL BACKGROUND

### A.  Ractopamine

56.     Ractopamine, or ractopamine hydrochloride, is believed to belong to a family of drugs called beta-agonists, which are used in meat production in the United States to increase animal growth.[2] Beta-agonists shift dietary energy balance toward skeletal muscle growth as opposed to fat deposition. Producers often feed beta-agonists to animals during the "finishing" stage of growth—the final period of weight gain before the animals are sent to slaughter—to encourage a last-minute increase in muscle mass and overall carcass weight, increasing the producers' profit margins.

57.     FDA approved ractopamine as a new animal drug for use in pigs in 1999, cows in 2003, and turkeys in 2008. *See* 21 C.F.R. § 558.500. FDA has also approved acceptable daily intake tolerances for human consumption of ractopamine residues and ractopamine residue tolerances in meat derived from cows, pigs, and turkeys. *See id*. § 556.570.

58.     In the initial approval, FDA concluded that an environmental impact statement pursuant to the National Environmental Policy Act was not required, despite also concluding there

---

[2] A 2014 study calls into question whether ractopamine is a beta-agonist or is instead an agonist of the trace amine–associated receptor 1, a receptor of methamphetamine.

was a "high amount of uncertainty" associated with its observations of the risks of chronic exposure to ractopamine.

59.     Ractopamine is widely used in the United States. For example, around 60–80% of pigs raised for food in the United States receive ractopamine, amounting to, at minimum, tens of millions of pigs each year. According to the U.S. Department of Agriculture's 2022 census, the United States animal agriculture industry sold over 240 million pigs in 2022 alone.[3]

60.     Available research, including from FDA's own files,[4] shows that ractopamine and other beta-agonists have substantial negative impacts on animal health and welfare, human health and safety, and the environment.

61.     Because beta-receptors are found throughout human and animal bodies as part of the sympathetic nervous system, the use of beta-agonist drugs is associated with extensive physiological and psychological side effects.

62.     Beta-agonists induce increased heartbeat, relaxation of blood vessels and muscle, and contraction of cardiac tissue. FDA scientists have also linked beta-agonists to cardiomyopathy in cows, a disease of the heart that makes it harder for the heart to pump blood to the rest of the body, and to other "adverse effects" on the heart. FDA is also aware of a link between beta-agonist administration and fatal respiratory distress in cows, which often occurs in conjunction with heat stress, overheating, or dust inhalation from dry conditions.

---

[3]  *See* U.S. Dep't of Agric., 2022 Census of Agriculture, Table 20, *available at* https://www.nass.usda.gov/Publications/AgCensus/2022/Full_Report/Volume_1,_Chapter_1 _US/st99_1_020_023.pdf.

[4]  From 2013 to 2019 Plaintiff ALDF received hundreds of thousands of pages of FDA records related to beta-agonists as the result of litigation under the Freedom of Information Act.

63.     Ractopamine is linked to significant health problems and behavioral changes in animals, such as cardiovascular stress, muscular skeletal tremors, increased aggression, hyperactivity, acute toxicity, and genotoxicity.

64.     Studies show that ractopamine mimics stress hormones, and therefore causes physical and psychological impacts associated with stress. Psychologically, ractopamine creates a permanent feeling of stress in pigs and cows. One study found that ractopamine has the psychological effect of ecstasy and methamphetamine on cows, pigs, and turkeys.

65.     Accordingly, ractopamine and other beta-agonists cause behavioral changes in animals, including an increase in aggressiveness. Highly stressed and aggressive animals exhibit behavioral problems and have difficulty socializing with other animals, resulting in more social hierarchy issues and fights within a flock or herd.

66.     Ractopamine and other beta-agonists are also associated with variety of adverse drug effects in animals including hyperactivity, trembling, hoof loss, lameness, broken limbs, inability to walk, and fatigued cattle syndrome. These and other side-effects from beta-agonists can lead to increased instances of nonambulatory disability in cattle, a condition in which cattle are too sick or injured to walk to slaughter. In 2015, the beta-agonist Zilpaterol, marketed as Zilmax$^{TM}$, was voluntarily withdrawn by its drug sponsor, Merck, because slaughterhouses throughout the United States reported concerns about nonambulatory, slow, and difficult-to-move cows, and cows with missing or severely deteriorated hooves.

67.     Due to these physical and psychological impacts, animals given ractopamine and other beta-agonists can be more difficult to handle. This increases the risk of these animals being treated inhumanely, as workers at CAFOs and slaughterhouses faced with catching and moving aggressive and/or mobility impaired animals will resort to more drastic and violent methods.

Animals who are more aggressive and stressed or are experiencing mobility issues due to ractopamine also present an increased risk of physically injuring workers.

68.     Ractopamine has been the basis of more reports from producers and researchers to FDA of sickened or dead pigs than any other drug given to pigs. FDA's data demonstrates more pigs have experienced adverse effects from ractopamine than any other veterinary drug.

69.     The reports of adverse effects to pigs include, but are not limited to, leg stiffness, paralysis, immobility, rapid breathing, severe redness of the skin, muscle tremors, walking with difficulty, frequent vomiting, decreased motor apathy, lacrimation, vasodilation affecting ears and abdomen, fever, bloody diarrhea, enlarged lymph nodes, cracked hooves, coughing, lung congestion, infections on the body, cannibalism, heart attack, aortic rupture, increased fighting, hyperactivity, high body temperature, pneumonia, aggressive sexual behavior, and death by frothy bloat and other means.

70.     Because the use of beta-agonists in animals increases the likelihood that they will suffer from conditions that cause them to collapse before slaughter, there are increased food safety risks to consumers of products derived from animals treated with ractopamine. Ractopamine increases the amount of *salmonella* found in cow feces. Additionally, increased exposure to stress, such as that experienced by animals given ractopamine, depresses the immune system, making animals more susceptible to pathogens, and increases animals' susceptibility to and shedding of zoonotic bacteria such as *salmonella*. Animals who collapse onto the floor from beta-agonist adverse effects also risk greater exposure to pathogens on the ground. These pathogens are carried into the slaughterhouse, creating additional contamination pathways that may expose consumers to increased health risks.

71.     Further, studies have shown that antibiotic resistant bacteria, including *salmonella*, can jump from confined cows and pigs to workers and humans in neighboring communities. Beta-

agonists negatively influence cows' and pigs' behavior, leading to increased risk of infection and therefore antibiotic use. Thus, beta-agonist use increases the risk of exposure to antibiotic resistant bacteria to humans who work at or live near CAFOs and slaughterhouses, or who eat products derived from these animals.

72.     FDA's own files contain reports of adverse reactions to beta-agonists in human workers and producers in the animal agriculture industry, as well as reports of beta-agonist residues in meat harming consumers. FDA has received complaints from workers and consumers who experienced nausea, dizziness, respiratory issues, and other serious medical conditions requiring treatment and hospitalization, after either being directly exposed to beta-agonists used on CAFOs or from consuming meat from animals fed beta-agonists.

73.     FDA's files also contain acknowledgements from its own scientists that humans with compromised cardiovascular systems react adversely to beta-agonists, and in fact FDA scientists encouraged beta-agonist drug sponsors to investigate cardiac issues with further beta-agonist studies after humans in a pilot study experienced heart tremors. FDA scientists have also stated that beta-agonists' "[e]ffects are not desirable for consumers of food containing residues of the drug."

74.     Prior to FDA's approval of ractopamine, Elanco Animal Health attempted only one human study of the drug. The study focused on the effects of ractopamine exposure on six men between 18 and 35 years old. One of these men developed an abnormally rapid heart rate early in the study and was removed. The study was designed to test escalating dosage levels but did not continue because the remaining five subjects experienced clinically significant increased heart rate at the lower dosage. FDA's Medical Officer Review of this study concluded "the data from this study do not provide adequate assurance that the expected ractopamine levels in meat products will be without cardiovascular pharmacological effects in man."

75.     The effect of ractopamine on populations including women, children, the elderly, pregnant and breastfeeding women has never been examined by FDA.

76.     Indeed, the use of ractopamine and other beta-agonists in animals raised for meat is banned or restricted in many other countries because of human safety concerns. At least 160 countries prohibit or restrict ractopamine use, including all European Union member countries, China, Japan, South Korea, and Russia. The European Food Safety Authority panel that banned ractopamine based its decision in part on the fact that its data could not support a conclusion that the drug is safe.

77.     In 2012, the Codex Alimentarius Commission, the United Nations international food standards body, adopted maximum residue limits for ractopamine that are less strict that those of the Europe Union member countries, China, and other nations. Yet these more lenient Codex standards are more stringent than current U.S. standards. For example, FDA's acceptable daily intake for total residue of ractopamine is 1.25 μg/kg of body weight per day, while the corresponding Codex standard is 0 to 1 μg/kg of body weight per day. *See* 21 C.F.R. § 556.570.

78.     FDA has not reviewed the Codex standards for ractopamine.

79.     Beta-agonists also harm the environment. Within the first three days of being administered ractopamine, animals excrete approximately 95% of the drug into manure. The ractopamine can then migrate to ground and surface waters from manure storage and disposal sites. Uneaten animal feed containing ractopamine may also be disposed of via burial, creating another potential source for the drug to leach into the environment. Moreover, in response to supply-chain bottlenecks, CAFO operators occasionally conduct mass killings of animals and bury the animals' bodies on-site, allowing drugs in these animals' bodies to leach into the ground. The environmental impacts of the release of ractopamine into the environment have not been fully studied and could threaten water quality and wildlife.

80.     Additionally, manure from animals fed ractopamine has higher levels of nitrogen, phosphorous, and sulfur than manure from animals not fed ractopamine. These increased nutrients contribute to ecosystem-disrupting nutrient pollution when the constituents from manure enter waterways.

**B.  Plaintiffs ALDF and CFS's 2012 Petition**

81.     On December 20, 2012, Plaintiffs ALDF and CFS petitioned FDA to review the Codex standards for ractopamine; publish the petition in the Federal Register and provide opportunity for comment; perform comprehensive scientific studies to characterize risks to animals, humans, and the environment posed by ractopamine use; and ban or, at minimum, adopt more protective standards for ractopamine use in pigs, cows, and turkeys. *See* Exhibit 1.

82.     In requesting review of the Codex standards for ractopamine, the 2012 Petition explained that United States standards for ractopamine residue tolerance in meat products are among the most lenient in the world, and even the more protective Codex standards do not offer sufficient animal welfare and human health protections. The 2012 Petition also identified inadequacies in the limited evidence supporting the drug's safety and mounting evidence, including the agency's own records, of the drug's harmful effects on humans, animals, and the environment.

83.     On December 20, 2012, FDA acknowledged receipt of the 2012 Petition and assigned it to docket number FDA-2012-P-1252.

84.     On June 6, 2013, FDA provided a tentative response to the 2012 Petition providing that it was under consideration, but "the Agency will require additional time to issue a final response because of the complexity and the number of issues raised in your petition." The FDA stated that it would issue a final response "after completing the analyses of all of the legal and policy issues raised in the petition."

85.     FDA has not issued a final response on the 2012 Petition.

**C. Plaintiffs ALDF, CBD, and FACT's 2020 Petition**

86.     On June 8, 2020, Plaintiffs ALDF, CBD, and FACT petitioned FDA for emergency rulemaking immediately suspending ractopamine's approval for use in pig and cow feed. *See* Exhibit 2. The 2020 Petition also requested withdrawal of ractopamine's approval because, independent of conditions created by the COVID-19 pandemic, ractopamine has not been shown to be safe for use.

87.     Like the 2012 Petition, the 2020 Petition documents harmful effects ractopamine has on humans, animals, and the environment. The 2020 Petition explained that ractopamine's continued use during the COVID-19 global pandemic presented an imminent hazard to human health and the environment because supply chain bottlenecks caused CAFOs to hold animals longer before slaughter and administered ractopamine for periods longer than normal. This results in increased likelihood of the animals suffering adverse effects from the drug and increased drug residues in meat products that enter the food supply. Moreover, during the COVID-19 global pandemic, CAFO operators were at times killing animals and burying the bodies on-site, thereby increasing the risk and volume of ractopamine residues in the environment.

88.     On June 8, 2020, FDA acknowledged receipt of the 2020 Petition and assigned it to docket number FDA-2020-P-1506.

89.     On December 17, 2020, FDA issued a "partial response" to the 2020 Petition.

90.     FDA denied the 2020 Petition as to its claim that ractopamine use presents an imminent harm to humans and animals due to conditions created by the COVID-19 pandemic.

91.     The partial response expressly did not respond to the 2020 Petition's request for withdrawal of ractopamine's approval independent of conditions presented by COVID-19. FDA stated: "In asking us to withdraw approval of the drug for use in swine and cattle, you make

assertions independent from those related to the conditions presented by the current global pandemic. Those assertions, and supporting evidence, are still being considered by the agency." Accordingly, FDA provided that the 2020 Petition's "request to withdraw approval of ractopamine for use in swine and cattle remains under review."

92.    FDA's partial response to the 2020 Petition also stated: "Petition FDA-2012-P-1252 [the 2012 Petition] also remains under review."

93.    FDA has not issued a final response on the portions of the 2020 Petition unresolved by FDA's December 17, 2020, partial response.

## FIRST CLAIM FOR RELIEF

### Unreasonable Delay in Deciding on the 2012 Petition

94.    Plaintiffs reallege and incorporate by reference all paragraphs in this Complaint as though fully alleged herein.

95.    The APA requires an agency to "conclude a matter presented to it" within "a reasonable time." 5 U.S.C. § 555(b). FDA has failed to comply with this requirement by failing to issue a final response to the 2012 Petition, to the detriment of Plaintiffs and their members, public health, the environment, and the millions of farmed animals who have suffered by way of ractopamine's continued use.

96.    Accordingly, FDA has "unreasonably delayed" agency action within the meaning of the APA, 5 U.S.C. § 706(1), by failing to issue a final decision on the 2012 Petition.

## SECOND CLAIM FOR RELIEF

### Unreasonable Delay in Deciding on the 2020 Petition

97.    Plaintiffs reallege and incorporate by reference all paragraphs in this Complaint as though fully alleged herein.

98.     The APA requires an agency to "conclude a matter presented to it" within "a reasonable time." 5 U.S.C. § 555(b). FDA has failed to comply with this requirement by failing to issue a final response to portions of the 2020 Petition unresolved by FDA's December 17, 2020 "partial response," to the detriment of ALDF and its members, public health, the environment, and the millions of farmed animals who have suffered by way of ractopamine's continued use.

99.     Accordingly, FDA has "unreasonably delayed" agency action within the meaning of the APA, 5 U.S.C. § 706(1), by failing to issue a final decision on the 2020 Petition's request for withdrawal of ractopamine's approval.

### **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that the Court:

a) Declare that Defendants' delay in providing Plaintiffs with a substantive response to their 2012 Petition is unreasonable within the meaning of 5 U.S.C. § 706(1);

b) Require Defendants to provide Plaintiffs with a substantive response to their 2012 Petition;

c) Declare that Defendants' delay in providing Plaintiff ALDF with a substantive response to the portions of the 2020 Petition unresolved by FDA's partial response is unreasonable within the meaning of 5 U.S.C. § 706(1);

d) Require Defendants to provide Plaintiff ALDF with a substantive response to the portions of the 2020 Petition unresolved by FDA's partial response;

e) Award Plaintiffs their attorneys' fees and all other reasonable costs for this action; and

f) Grant Plaintiffs such additional relief as the Court may deem just and proper.

DATED: March 26, 2024, in Washington, DC

Signed: _/s/ Daniel H. Waltz_____

ANIMAL LEGAL DEFENSE FUND

Daniel H. Waltz, Bar No. D00424
611 Pennsylvania Ave., S.E. #484
Washington, D.C. 20003
(707) 795-2533
dwaltz@aldf.org

Larissa U. Liebmann, Bar No. NY0342
767 Broadway #1209
Manhattan, NY 10003
(707) 795-2533
LLiebmann@aldf.org

Mary-Bailey Frank, _pro hac vice forthcoming_
3600 N. Duke St. STE 1 #1131
Durham, NC 27704
(707) 795-2533
bfrank@aldf.org

_Attorneys for Plaintiffs Animal Legal Defense Fund,
Center for Food Safety, Center for Biological
Diversity, and Food Animal Concerns Trust_

CENTER FOR FOOD SAFETY

Sylvia Shih-Yau Wu (CA Bar No. 273549)
600 California Street, Suite 12-013
San Francisco, CA 94108
Phone: (415) 826-2770
Email: swu@centerforfoodsafety.org

_Attorney for Plaintiff Center for Food Safety_